Argued March 27, affirmed May 29, 1928.

## COOS COUNTY *v.* I. A. ELROD et al.

(267 Pac. 530.)

**Counties — County Employee must Impart to Superiors Material Information Acquired in Course of Employment.**

1. County employee owes duty to his principal to be loyal and to impart to his superiors material information acquired in the course of his employment as in case of employee of private individual.

**Taxation — Clerk in Sheriff's Office, Charged With Private Sale of Property Recovered for Delinquent Taxes, was Required to Obtain Best Bid Possible and Advise County Court of Circumstances Affecting Confirmation.**

2. Clerk in sheriff's office, charged with private sale of property recovered by county through foreclosures of delinquent tax certificates, after failure to obtain bids at public sale, was under duty to obtain best bid possible, and to advise court of all circumstances which would render the acceptance of the bid justifiable or otherwise.

**Taxation — County's Deed to Property Recovered for Delinquent Taxes, Where Negotiated by Employee in Sheriff's Office for Minimum Price, Discouraging Higher Bids, Held Subject to Cancellation.**

3. Where employee in sheriff's office, charged with private sale of property recovered by county for delinquent taxes, accepted tender of bid from a business associate at minimum upset price far below real value of property, discouraged applicants interested in purchasing property at higher figure, and failed to inform county judge of circumstances in obtaining confirmation of sale, deed was obtained through fraud, and county was entitled to cancellation as against grantee having notice.

1. See 22 R. C. L. 461.

Estoppel—County Held not Estopped to Cancel Conveyance by Having Parted With Deed, Where Reliance on County's Representation was not Shown.

4. County *held* not estopped to claim cancellation of deed to property recovered by it for delinquent taxes on account of employee's fraud by fact that county had parted with the deed, where no reliance on representation was shown.

Taxation—County Which, on Cancellation of Deed, Would Secure Increased Price, had Sufficient Interest to Maintain Cancellation Suit, Though Third Parties Guaranteed Costs.

5. Fact that individual had entered into undertaking with county to pay costs and save county harmless in prosecution of suit to cancel deed to property recovered for delinquent taxes did not deprive county of real interest necessary to maintain suit, where county was bound to secure more than price paid by grantee in case outcome of suit was favorable.

Agency, 2 C. J., p. 714, n. 92.
Estoppel, 21 C. J., p. 1126, n. 51.
Taxation, 37 Cyc., p. 1374, n. 24.

From Coos: James W. Hamilton, Judge.

Department **1.**

[Affirmed.

For appellant there was a brief and oral argument by *Mr. Wm. T. Stoll.*

For respondent there was a brief over the name of *Mr. J. B. Bedingfield,* District Attorney, with an oral argument by *Mr. Arthur K. Peck.*

ROSSMAN, J.—This is a suit to cancel a deed executed by the sheriff of Coos County in his representative capacity to the defendant I. A. Elrod. The property described in the deed was previously owned by one Myrtle Allen. She neglected to pay the 1909 and subsequent taxes amounting to $373.19. In 1916 the county instituted suit to forclose the certificate of tax delinquency and secured title. Having acquired ownership of the property the county offered it for

sale. Pursuant to law and the practices followed by the County Court, the latter placed upon this property what was known locally as an "upset price" of $200; that is, $200 was the minimum which the County Court authorized the sheriff to entertain as a bid at the public offering. When this property was offered at public sale, no buyer presented himself. Four public offerings were made, the last taking place October 17, 1921; but the property still remained unsold.

The record is silent as to what occurred from this last public offering until approximately April 6, 1927. On this latter date one Jess Barton, who was engaged in the abstract of title business and also that of purchasing tax titles, applied to the defendant Nels Osmundson, a clerk in the office of the sheriff of Coos County, and expressed a desire to purchase this property from the county. The particular duty assigned to Osmundson by his superior was that of having charge of the sale of property recovered by the county through foreclosures of delinquent tax certificates. Coos County had developed a practice of selling at private sale tax properties which had failed to secure a buyer at their public offerings. These properties were called "junk properties." Prior to their offering, the County Court would place upon each an upset price; this upset price, as we have explained before, was the minimum amount which the court would consider as an offer for the property. When Barton applied to Osmundson to purchase this property, the latter advised Barton that the county was not the owner of this property and that the records showed that this property was marked "sold." Barton replied that he had investigated and that the ownership of the property was in fact vested in the county. This apparently satisfied Osmundson, and Barton

thereupon paid the former $200. Osmundson follow-ing the routine procedure which he pursued in such instances, prepared a brief memorandum setting forth the legal description of the property, the minimum price fixed by the County Court, the price offered by Barton, and the name of the prospective buyer, and presented this memorandum to the county judge. The latter, likewise, followed his general practice, and without making inquiry, signed an order requiring the sheriff to execute a deed to the buyer; this the latter did. The county judge testified that whenever Osmundson presented such a memorandum, he as-sumed that it was presented in good faith, and that it correctly set forth the facts and the required in-formation.

Barton did not take title in his own name, but had the deed show that the defendant, Elrod, was the buyer. While the record indicates that the minimum or upset price of this land was $200 the uncontradicted evidence shows that its real value was not less than $6,000. Elrod, in whose name title was taken, had never been upon the property and knew nothing of it. When a third party by the name of Fish sought to purchase the property from Elrod, the latter pro-tested that he was not the owner and said he knew nothing of the property. When Fish informed Elrod that the record showed him as owner, he as-serted that evidently Fish was thinking of another Elrod who resided in Portland. Barton and Osmund-son, together with one Gage, were the three stock-holders and directors of a corporation entitled "The Bandon Realty Company," which had been actively engaged for some years in the purchase of property at tax foreclosure sales. There is evidence in the rec-ord which indicates that in order to facilitate their

operations they maintained a deposit of funds with some individual in the sheriff's office. Osmundson testified that this piece of property was not purchased for the company but for Elrod. But as we have seen before, Elrod testified that he was not the buyer, but that Barton was the buyer. Whatever may have been the arrangement between Osmundson, Elrod, Barton and the Bandon Realty Company concerning this piece of property, apparently no outsider was aware of the fact that Elrod held title only as trustee until he so stated as a witness.

How it occurred that the county records showed that this piece of property was marked "sold" and that the upset price was $200 is not disclosed by the evidence. It appears that many inquired of Osmundson concerning this property for the purpose of acquiring title; each was informed that the property had been sold. Among those who inquired was one Frank J. Fish, a logger and timber cruiser. Fish had been interested in an adjoining tract of timber land; he noticed that this tract of land contained a valuable stand of timber. He cruised it and then decided he would like to log it. He inquired of Osmundson concerning the ownership and testified concerning the results of his inquiries as follows: "I didn't get no satisfaction, only an address in Seattle of the lady that owned it." Fish then testified that he communicated with the Seattle owner with the following results:

"I got in communication with her and made an agreement to buy a quit-claim deed from her at a certain price and came back down here and went to Mr. Osmundson in the office and wanted to know about the taxes and he said,—I think he told me $400, but he couldn't pay it because it was advertised to be sold

the 28th,—well, the last tax sale, I have forgotten, the 20th of August or September.

"Q. What time was this when he told you this? A. It was in the last of March, along the latter part of March. So I says 'What's the matter with me taking a certificate out on that or paying it up and then paying the lady for it and getting a good deed to it?' and he says 'you can't do it, there is no way to do it, it can't be done, it is advertised to be sold,' and he says 'There is no chance at all,' and I went home and I got to studying about it and I came back again on the 11th day of April, and I had other ideas in my head and there was something wrong about it, and I found out that I would have a right to pay those taxes, and at that time I asked about it and Mr. Osmundson looked at a little slip of paper and on that slip of paper it said 'deeded to I. A. Elrod, address Coquille.'

"Q. What date was this? You say the 11th of April? A. The 11th of April."

We shall review the evidence no further; in our opinion it supports the conclusion that Osmundson was well aware of the fact that just before Elrod secured title, there were many inquiries concerning this property, and that several were anxious to acquire its ownership. Further, that those interested proceeded no further with their endeavors to acquire ownership when they were informed that the property had been sold. Further it appears that the county commissioners were unaware of the foregoing facts, and that Osmundson did not communicate these facts to them when he presented the memorandum to the county judge. In addition to the foregoing the evidence indicates that Fish was quite willing to have paid in excess of $500 for this property. As we have seen before he was met first with a statement that the owner lived in Seattle, next that the property was to

be later sold for delinquent taxes, and that hence he could not purchase, and finally after he had learned that under such circumstances he could purchase and when he came back for the purpose of doing so, Osmundson showed him a piece of paper setting forth that Elrod had already purchased.

1. Primarily we are not concerned with the rights of Fish, nor of any individual. The county is the plaintiff that brings for our consideration this dispute. To us it seems that the county's rights were disregarded by one of its employees, a clerk in the sheriff's office. In justification to the sheriff we should add that following the foregoing disclosures he retained Osmundson in his employ no longer. The duty which Osmundson disregarded was that of loyalty to his employer. It is as much the duty of a county employee to be loyal to his principal and impart to the governing heads of the county material information acquired by him in the course of his employment, as it is the duty of the employee of a private employer to do likewise.

The complaint in appropriate language sets forth allegations under which the above evidence was admitted. These allegations charged that the defendants defrauded the county and thus obtained the deed. The principles of law applicable to such a controversy are well established. They have been enunciated often by the courts and text-book writers. A brief review will suffice. Thus Mr. Justice Peckham in *Robinson* v. *Chamberlain,* 34 N. Y. 389 (90 Am. Dec. 713), succinctly states: ''The law presumes that an office is created for the benefit of the public * * An officer really contracts with the Government faithfully to discharge the duties of his office.''

In 22 R. C. L., Public Officers, Section 124, we find:

"Every public officer is bound to perform the duties of his office faithfully, and to use reasonable skill and diligence and to act primarily for the benefit of the public. In other words he is bound, *virtute officii* to bring to the discharge of his duties that prudence, caution and attention which careful men usually exercise in the management of their own affairs."

In Mechem on Agency (2 ed.), Section 1207, we find:

"It is always the duty of an agent, as will be more fully seen hereafter, to fully inform the principal of all facts relating to the subject-matter of the agency which come to the knowledge of the agent, and which it is material for the principal to know for the protection of his interests. This duty, moreover, has a specific application in this connection which justifies a reference to it here. As has been already seen, it is absolutely essential, when an agent undertakes to sustain dealings with his own principal, that it shall appear that the agent frankly and freely gave to his principal full information respecting, not only the agent's relation to the contract, but also, the various conditions respecting time, value, situation, condition and the like, which may fairly be deemed to be material in determining upon the desirability of entering into the contract. But even where the agent is not personally interested in the contract, his duty to give the principal full information of all the material facts relating to the transaction, which are within his knowledge, still exists. A failure to perform this duty, while not necessarily rendering transactions with third persons voidable, as it would do if the agent were himself personally interested, will still make the agent liable to the principal for any losses which he has proximately sustained thereby. Frequent illustrations are found in the cases in which agents for the sale of property, and the like, have permitted the principal to sell his property at a certain price without

informing him of what the agent knew, namely, that
he could procure better terms."

In 2 C. J., Agency, Section 369, we find.

"Loyalty to his principal's interests requires that
an agent shall make known to his principal every
material fact concerning his transactions and the sub-
ject matter of his agency that comes to his knowl-
edge. * * "

2, 3. The evidence fully warrants the conclusion
that these well-established principles of law were dis-
regarded when Osmundson permitted Barton to pur-
chase, in the name of Elrod, this property. Barton
and Osmundson for some years had been associated in
the business of purchasing tax titles. Osmundson
permitted his friendship for Barton, or his personal
interest in his business ventures to supersede loyalty
to his principal, the county. Two hundred dollars was
not the price set by the County Court as the sale price
for this property. It represented merely the mini-
mum below which the county would consider no of-
fers. It was Osmundson's duty to obtain the best bid
possible, and to advise the County Court of all cir-
cumstances known to him that would render the
acceptance of the bid justifiable or otherwise. Disre-
garding this duty, he accepted the $200 tender, took it
to the county judge, and permitted the latter to con-
tinue in the belief that no new circumstances had
developed since $200 was fixed as the upset price.
The latter was also unaware of the fact that through
error the record showed this property marked "sold,"
and that many prospective buyers had turned away
misled by this erroneous notation. As a matter of
fact Osmundson knew that $200 was not the best
price which could be obtained, because Fish was will-
ing to pay considerably in excess of that amount.

125 Or.—27

Osmundson had also falsely stated to Fish that there was pending some proceedings for a public sale of this property. These phantom proceedings caused Fish to postpone further efforts of purchase and afforded Barton an opportunity to buy before Fish returned. The county judge knew nothing of this circumstance. These facts cause us to agree with the conclusions of the learned Circuit Court that the county parted with the deed through fraud. It is very evident that Barton was aware of enough of these circumstances that his deed should be canceled.

4. The defendants argue that the county should be estopped because it has parted with the deed. At least one of the essential elements of estoppel is missing in this cause; that is, reliance upon the representation. For a discussion see *Bramwell* v. *Rowland,* 123 Or. 33 (261 Pac. 57).

5. It is also argued that because two individuals, Paulson and Walker, entered into an undertaking with the county to pay the costs and save the county harmless if it prosecuted this cause, the county has in fact no real interest. Without proceeding to review the facts, we find that the circumstances are such that the county is bound to secure more than the $200 paid to it by Barton by the successful conclusion of this suit; hence it has a real interest.

It follows from the foregoing that the decree of the lower court should be affirmed. The plaintiff may have its costs.     AFFIRMED.

RAND, C. J., and COSHOW and McBRIDE, JJ., concur.